IN THE

# SUPREME COURT OF THE STATE OF GEORGIA,

## AT MILLEDGEVILLE,

### JUNE TERM, 1866.

Present—JOSEPH H. LUMPKIN, Chief Justice.
DAWSON A. WALKER, } Judges.
IVERSON L. HARRIS, }

———————◆•◆•◆———————

LEWIS L. ABBOTT, plaintiff in error, vs. THOMAS M. DERMOTT, defendant in error.

[1.] Ignorance of fact is no cause for rescinding a contract.
[2.] On the first of May, 1865, after General Johnston had surrendered the forces and territory under his command, and before that event became known in Atlanta, Dermott sold and conveyed to Abbott certain real estate in that city, receiving from him the agreed price, in treasury notes of the Confederate States, both parties being alike ignorant of the surrender. The currency became valueless very soon after news of the surrender was received: *Held*, That a court of equity will not rescind the contract and cancel the deed, at the instance of Dermott, the vendor.

In Equity. In Fulton Superior Court. Motion to dissolve injunction. Decided by Judge WARNER. April Term, 1866.

In February, 1866, Dermott, the defendant in error, filed his bill in equity against Abbott, the plaintiff in error, making, as subsequently amended, the following case:

On the 18th or 19th of April, 1865, General Johnston surrendered to the Federal authorities the Confederate forces under his command, and all territory east of the Chattahoochee river. The city of Atlanta was thus, on the first of

May, within the military lines of the United States, and so remained; but the news of the surrender was suppressed as much as possible by the military authorities. General Sherman had cut the railroads between Georgia and North Carolina, and communication between Atlanta and the scene of General Johnston's operations was very much disturbed, if not broken up. Information of the surrender had, consequently, not reached Dermott, in Atlanta, on the first of May. Knowing nothing of it, he, on that day, conveyed to Abbott, by deed, a house and lot in the city, worth now $5,000 in United States currency, but for which he received no consideration of any value whatever, as he took in payment for it $30,000 in treasury notes of the Confederate States, which, although he did not know it, were then, by reason of Johnston's surrender, and the breaking up of the Confederate Government, uncurrent and absolutely worthless.

Being a dealer in groceries, he left Atlanta on the next day for Albany, Ga., to invest these notes in groceries, traveling by railway. When he reached Macon he heard, for the first time, of the surrender, and that Confederate notes were certainly uncurrent and worthless. Nevertheless, he went on to Albany, but could buy nothing with them. He then hurried westward with all possible expedition as far as Enterprise, Miss., where he learned they could not be used east of the Mississippi river. Returning to Mobile, he sent $25,000 of them by an agent up Red river to be invested in something, if possible; but it turned out that the proceeds of $8,900 were only $16.10 in United States currency, while the expenses of the agent were $46.65. The agent returned to Dermott the remaining $21,000, all of which, except a few bills given away, he has still on hand.

Soon after making the deed, he rented from Abbott the house and lot at $25.00 per month, giving therefor his obligation in writing. Afterwards, under a mistake of law, believing that this obligation bound him, he paid the rent for July and August. He was delayed in obtaining legal

Abbott vs. Dermott.

advice and the needful information as to his rights, by the fact that Atlanta had been burned down, her people banished, and her business suspended : so great were the confusion and uncertainty, that he was unable to look into his affairs and get the advice requisite to guide him.   When he did obtain it, he tendered back to Abbott $30,000 in Confederate States Treasury notes, (which tender he repeats and continues in his bill) and gave him notice that he no longer considered himself his tenant.

Abbott, thereupon, instituted legal proceedings to expel him as a tenant holding over, and caused a distress warrant to issue for double rent.   Dermott was compelled to give bond and security for the eventual condemnation money. Another distress warrant for double rent was issued, and the same is now in the hands of the Sheriff to be levied. On account of his poverty, Dermott is unable to give the large bonds required, and which he apprehends will be required if distress warrants continue to issue.

Averring that the Confederate notes received were of no value, yet he offers, should it be found otherwise, to account for them.

The bill prays for an injunction against the distress warrant in the Sheriff's hands, and against all other proceedings at law touching the matters in question, and for a decree that the deed, as well as the obligation to pay rent, be delivered up to be canceled, and that defendant refund the money paid him for rent; or, that he be decreed to pay for the house and lot a fair and just price in good current funds.

The injunction was granted; and the defendant answered the bill, and moved to dissolve it, upon the ground that the equity of the bill was sworn off.

The Court overruled the motion; and that is the error alleged.

D. F. HAMMOND and BARNETT & BLECKLEY, for plaintiff in error.

BROWN & POPE, for defendant.

Lупмркін, C. J.

It is admitted that all the allegations in the bill are met and fully answered; but the presiding Judge thought it best, nevertheless, to hold up the bill till the hearing, and this practice is allowable where the complainant was entitled to any relief in the case made. But in the judgment of this Court he is not: in other words, we think there is no equity in the bill.

What is the complainant's case? Why, that on the first day of May, 1865, he and Abbott, both grocery merchants in the city of Atlanta, contracted for a house and lot in that city, Abbott paying him $30,000 in Confederate money, whereupon, he executed to Abbott a deed to said property, and continuing, nevertheless, to occupy the same under a contract of rent with the vendee. That at the time of the sale, neither Abbott nor himself knew that Gen. Johnston had, some days previously, surrendered his army to General Sherman, and, with it, all the territory east of the Chatahoochee river, thereby rendering the Confederate currency utterly valueless, and stopping its circulation, which, at the time of the trade, was selling at Atlanta at $200 for $1 in gold; that he hurried off immediately to South-western Georgia, hearing, for the first time, in Macon of the surrender of the Confederate forces; that from Albany he went to Mobile, from which place he dispatched an agent to proceed up the Red river, in order to exchange the bills for groceries, but all to little or no purpose—the agent not realizing enough to defray expenses. Finally, the money received in payment was tendered back to Abbott, and Dermott, upon professional advice, disaffirmed the contract, and by this bill seeks its rescission.

And counsel for Dermott argues that the complainant having acted through a mistake of facts, to-wit, the surrender of Gen. Johnston's army, he is entitled to a rescission; and he endeavors to analogize this case to the discharge of a

contract in spurious bills, or the notes of an infant, or of a broken bank, where courts of equity have granted relief.

In our view, this case stands upon different principles wholly. Like the contracts made throughout the country during the war, the parties bargained with each other in reference to Confederate currency. The house and lot which is the subject matter of this litigation, is valued by Dermott at $5,000 in greenbacks, by Abbott at $2,500 ; and yet the latter paid the former $30,000. All contracts were speculative, pretty much; and the risk was the success of the Confederacy and the payment of its currency ; and each party judged for himself as to the chances. Mr. Dermott seems to be equally tremulous as to the value of his house and lot in Atlanta as about the Confederate currency: hence, he is found soliciting Abbott to purchase it, giving him five days to consider his proposition. We will merely add that Mr. Dermott is found endeavoring to exchange his money for produce, with a full knowledge that the Southern armies had been surrendered. He did not intend to act fraudulently, perhaps, but he supposed he might find in the West, especially the Trans-Mississippi, some, more confident than himself, who would still take the money.

And why should General Johnston's surrender be seized upon as the epoch, or event, which is to determine the validity of contracts? It is only one act in the drama: all thoughtful men knew that the cause was hopeless before as well as after the surrender. The slide had commenced before: the surrender was the avalanche that prostrated everything before it. But we repeat, that all this was a matter of judgment and opinion, differing in each individual according to his temperament—viz, whether he was more or less hopeful.

But suppose that General Johnston's surrender was the hinge upon which this contract hung, is it a *mistake* of fact as to that event? Is it not clearly an ignorance of fact, which the Code declares, emphatically, shall not be sufficient to rescind the contract, (section 2592)? And such was the doctrine of the law before the Code.

Set aside this contract, and who can foresee or predict the consequences of establishing such a precedent ? Two men contract for a lot of cotton in New York, Liverpool, or elsewhere. By the last steamer, quotations stood so and so as to the market. Parties make their sales and purchases. By the arrival of the next packet, produce has either advanced or receded, and relief is sought from the ruinous speculation. So, as to all transactions of this kind, with regard to prices regulated by Confederate currency, men took the chances; and wherever they have executed their contracts without any imputation of fraud, let them stand. Any other rule would be ruinous.

Had Abbott known of the surrender and had not disclosed it to Dermott, and yet did or said nothing to mislead him, equity could have afforded no relief. How shall he be entitled to the aid of equity, when Abbott was as ignorant as himself of the surrender ?

We, therefore, overrule the interlocutory decree holding up the case for a hearing, not only because the answer fully denied all the facts in the bill upon which the complainant sought for relief, but for the broader reason that there is no equity in the bill.

Judgment reversed.